| | | |
|---|---|---|
| ANTONIO SILVA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-301S |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

      The disability application of Plaintiff Antonio Silva poses the challenge of how to evaluate a claim arising from a medical condition that has actively evolved over the period of alleged disability, beginning at onset with a fall that resulted in a terrible head injury requiring brain surgery, hospitalization and in-patient rehabilitation for four months, with a setback in the course of recovery when he developed a residual seizure disorder that has not been entirely controlled by antiepileptic medication. The complexity of the analysis was exacerbated by the discovery through state agency testing that, whether caused by the fall or persisting since childhood, Plaintiff's cognitive functioning is in the extremely low/borderline range. The matter is before this Court on his motion to reverse the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the decision of the Administrative Law Judge ("ALJ") was infected by errors of law and not supported by substantial evidence because the ALJ failed to consider Plaintiff's cognitive limitations related to work pace and/or speed in

the Residual Functional Capacity ("RFC")[1] finding and erred in his evaluation of the second opinion of Plaintiff's primary care physician, Dr. Mariel Del Rio Cadorette.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that, despite the ALJ's valiant effort to manage the complex medical issues presented by this case, the Commissioner's decision that Plaintiff is not disabled is tainted by errors that require remand pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, I recommend that Plaintiff's Motion to Reverse with a Remand for Rehearing the Decision of the Commissioner (ECF No. 8) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be DENIED.

## I.      Background

### A.      Plaintiff's History

Plaintiff was forty-five years old on his alleged onset date of disability (February 26, 2011). Tr. 269, 278. He is one of eleven children born in the Azores, Tr. 376, has a limited education (ninth or tenth grade),[2] Tr. 76, 322, and worked for over twenty years for various landscaping companies, with his income peaking in 1994 at $14,439, Tr. 301; he was laid off in 2008 due to lack of work and searched for a new job until his fall in 2011. Tr. 76, 322. Other than his failure to complete high school, there is no pre-onset information in the record about Plaintiff's cognitive functioning; when asked, he denied either developmental delays or receiving special education. Tr. 379-80.

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

[2] The record is ambiguous: Plaintiff testified that he completed ninth grade, Tr. 76, while a disability form completed by his sister indicates tenth grade. Tr. 322.

On February 26, 2011, Plaintiff fell down eight steps while intoxicated[3] and sustained a traumatic brain injury, which required immediate brain surgery to relieve swelling. Tr. 341-42. He remained hospitalized at Rhode Island Hospital until April 11, 2011, when he was transferred to the rehabilitation facility at Memorial Hospital; he stayed at Memorial until June 7, 2011. Tr. 360-61, 596. The hospital discharge summary notes that he "remained stable through his hospital course with significant cognitive deficits;" in rehab, he continued to display reduced reasoning and recall, though both improved during his in-patient stay. Tr. 341, 360. Shortly after discharge from Memorial, he had a cranioplasty to close the skull flap opened during brain surgery. Tr. 368, 370. Also in June 2011, the neurologist discontinued the anti-seizure medication (Keppra) that he had been taking prophylactically because there had been no seizure activity during the hospitalization. Tr. 369. After the cranioplasty, Plaintiff moved home with his parents and sister. Tr. 74-75. In July 2011, he started treating with his primary care doctor, Dr. Cadorette, who noted that he was still experiencing headaches and dizziness and that she would need to order a psychological evaluation. Tr. 485. During physical examination, she found balance problems. Tr. 486.

In August 2011, two additional medical/psychological challenges became newly apparent.

First, on August 10, 2011, in connection with Plaintiff's applications, state agency psychologist Dr. Jorge C. Armesto performed a consultative psychological evaluation that included a clinical interview and a battery of cognitive functioning tests. Tr. 376. During the interview, Dr. Armesto observed slurred speech and, significant to the seizure disorder that was not yet diagnosed, noted Plaintiff's report of left arm/right leg weakness and episodes of mental

<hr>

[3] The record reflects that Plaintiff was actively abusing alcohol in the period prior to the fall, Tr. 341, but that his withdrawal from alcohol was treated during his hospitalization at Rhode Island Hospital and he has sustained sobriety since. Tr. 96, 341. The materiality of substance abuse is not an issue in this case. Tr. 15.

blankness: "I get dizzy spells, I get headaches and I get confused." Tr. 376. Dr. Armesto's testing yielded a full scale intelligence quotient ("IQ") of 65, together with nonverbal reasoning and the ability to process simple material without errors in the "extremely low range," while testing of verbal reasoning ability and the ability to sustain attention, concentrate and maintain mental control, including to hold information in short term memory, yielded results in the "borderline range." Tr. 377-78. On testing of core academic ability, Plaintiff scored in the "lower extreme range" on both reading comprehension and math computation. Tr. 379-80. Dr. Armesto opined that, "[c]laimant's ability to respond to customary work pressures is decreased" and that "[Plaintiff] would have extreme difficulties securing other type of employment [than landscaping] due to his overall cognitive profile." Tr. 377, 381.

The second August 2011 development was the confirmation that the symptoms Plaintiff had described to Dr. Cadorette and to Dr. Armesto were seizures. Specifically, on August 19, 2011, Plaintiff was admitted through the Rhode Island Hospital emergency department based on complaints of woozy sensation, lightheadedness, left chest/arm tightness and the sensation of "being out of it," followed by an episode observed by family members lasting four minutes during which he experienced left side tightness, looked to the left and became non-responsive. Tr. 385. In the emergency room, staff observed postictal confusion and then a full seizure with left extremity twitching. Tr. 385. These phenomena were diagnosed as "seizure" and Plaintiff was restarted on anti-seizure medication. Tr. 386-92. Due to cost considerations, he was discharged on August 20, 2011, with Dilantin instead of Keppra. Tr. 33-34, 386.

In December 2011, Plaintiff's sister brought him back to Rhode Island Hospital complaining of three days of nausea, stomach pain, with a feeling of being lost, left-side weakness, confusion and difficulty finding words. Tr. 388. While being evaluated, he had an

observed clonic seizure.  Tr. 388.  Plaintiff did not regain normal mental status until the following day; he was discharged on Keppra (1000 mg twice daily) because he was allergic to Dilantin.  Tr. 389, 392.  His discharge diagnosis was "recurrent seizure adult."  Tr. 402.  The "continuity of care form" he was given at discharge advised that he should "call physician" if he had a new seizure.  Tr. 432.  He saw his neurologist Dr. Xiao Qing Wang on December 20, 2011, who increased the Keppra dose to 1500 mg twice daily.  Tr. 395.  None of the records associated with these encounters suggest that these seizures were caused by Plaintiff's failure to comply with the prescribed antiepileptic medication regime.

At his follow-up appointment with Dr. Cadorette on January 11, 2012, she noted that Plaintiff was complaining of "left side body tingling, right ribs tender."  Tr. 479.  At the next examination with Dr. Wang on January 17, 2012, Plaintiff was assessed as "now present[ing] with recurrent focal seizures;" Dr. Wang noted, "now new episode of L sided cramping and numbness most suspicious for focal seizures" and recorded that Plaintiff had reported fatigue, left side cramping, confusion and headache over a course of days.  Tr. 393.  When Plaintiff saw Dr. Cadorette in March 2012, she optimistically wrote, "now seizure-free since on [K]eppra," and noted that he was following up with a neurologist.  Tr. 477.  However, when Plaintiff saw Dr. Wang in May 2012, she wrote that, since January, Plaintiff had experienced two episodes of left-side numbness, each lasting for several minutes, and episodes of unsteadiness.  Tr. 383.  Dr. Wang recorded that Plaintiff "continued to have some episodes suggestive of focal seizure activity characterized by numbness and tingling on [K]eppra;" she noted the need to "continue to follow up levels and episodes."  Tr. 384.

Plaintiff was still experiencing these episodes when he next saw Dr. Cadorette in July 2012; he reported left arm numbness/tingling, confusion, and profuse sweating, which she noted

as "similar" to episodes in the past. Tr. 475. She recorded his diagnosis as "epilepsy and recurrent seizures." Tr. 475. At the next appointment with Dr. Cadorette, she completed disability forms, noted recurrent seizure disorder, which was being followed by Dr. Wang, and continued Neurontin for left-side paresthesia. Tr. 486. At his last appointment in the record with Dr. Cadorette, in January 2013, Plaintiff complained of cramping in the left side upper extremities, which she linked to the head trauma. Tr. 609.

Since the fall, Plaintiff has lived with his parents and sister, essentially doing "nothing." Tr. 75, 91-92 (Plaintiff testifies that he watches TV, goes in the backyard and "go[es] through" the paper). He was unable to complete the Function Report without assistance; it was done for him by his sister in April 2011, while he was still at Memorial Hospital. Tr. 309. In the form, she wrote that she has to explain to him what is going on and he does not walk the way he used to; he loses his balance and has memory lapses and confusion. Tr. 309-15. Because of the risk of seizure, he cannot drive. Tr. 75. At the hearing, Plaintiff's difficulty in understanding and answering simple questions is apparent from the transcript.[4]

**B.     Opinion Evidence**

Shortly after Plaintiff's in-patient treatment ended, on July 22, 2011, state agency physician Dr. Stephanie Green reviewed the record and projected that Plaintiff would recover from the fall sufficiently to meet the exertional requirements of medium work. Tr. 134-35, 145-46. Then, on August 10, 2011, Plaintiff met with Dr. Armesto for the consultative psychological

---

[4] For example, after describing serious difficulty with walking, when asked how long he can walk without resting, Plaintiff illogically answered, "I can run for about 45 minutes." Tr. 83. Similarly, when Plaintiff testified that he goes to the hospital every time he has a seizure, his attorney pointed out the numerous record references to reports of seizure activity when he did not seek medical care or went to Dr. Wang, but not to the hospital. Tr. 100-01; see also Tr. 432 (Plaintiff advised to call doctor, not go to hospital, when he has seizure). Noting this obviously incorrect answer, the attorney represented that he (the attorney) had had difficulty in asking Plaintiff questions and "him understanding what I've asked." Tr. 101. A third example of an answer evincing lack of comprehension is Plaintiff's statement that he had been experiencing seizures every other day "going back about two weeks," which is plainly inconsistent with other statements attributed to him in the record. Compare Tr. 42, with Tr. 607.

examination, the first and only (as far as this record reveals) time that Plaintiff was so evaluated. Tr. 376-82. Dr. Armesto administered the Wechsler Adult Intelligence Scale Fourth Edition ("WAIS-IV"), the Mini-Mental Status Exam-2 and the WRAT-IV, which yielded scores in the extremely low or borderline range. Tr. 377-80. In addition to extremely low IQ scores, testing revealed that his ability to sustain attention, concentrate, exert mental control and hold information in short-term memory was borderline, and his ability to process simple or routine visual material without making errors was in the extremely low range. Tr. 377-79. The mental status examination produced findings of decreased psychomotor functioning and emotional issues from adjustment to his medical problems. Tr. 380. Dr. Armesto diagnosed adjustment disorder and borderline intellectual functioning, and assigned a Global Assessment of Functioning ("GAF")[5] score of 45. Tr. 380. Noting that whether Plaintiff can sustain the physical demands of his former employment (landscaping) is a matter for a physician, Dr. Armesto opined: "[c]laimant's ability to respond to customary work pressures is decreased" and that "he would have extreme difficulties securing other type of employment due to his overall cognitive profile." Tr. 377, 381.

Three days later, with epilepsy still undiagnosed, on August 15, 2011, state agency psychologist Dr. John J. Warren reviewed the file and determined that Plaintiff's cerebral trauma and organic mental disorders were severe, but caused mostly mild restrictions, with moderate

---

[5] A GAF score of 45 indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32-34 (4th ed. 2000) ("DSM-IV-TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-5"). In response, the Social Security Administration ("SSA") released an Administrative Message (AM-13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited July 17, 2015).

difficulties only with concentration, persistence or pace.  Tr. 132-33.  Based on the expectation

that he would continue to improve, despite the observation that, with his education and work

history, "baseline intelligence could be borderline," Dr. Warren concluded that Plaintiff can meet

the mental demands of simple work.  Tr. 136, 143, 147.

Plaintiff's applications were denied initially on August 17, 2011.  Tr. 138-39.

On September 21, 2011, Plaintiff's primary care physician, Dr. Cadorette, prepared a

short opinion based on Dr. Armesto's test results and the seizure diagnosis.  Tr. 483.  With a

treating relationship of only two months (and only two prior appointments), she concluded that

Plaintiff suffers from moderate dizziness and seizures, which preclude him from sustaining

competitive full-time employment.  Tr. 488-89.  On October 6, 2011, a second state agency

psychologist, Dr. Jeffrey Hughes, affirmed Dr. Warren's findings, while on October 24, 2011,

Dr. Arvind Chopra affirmed those of Dr. Green.  Tr. 156-60.  Based on the expectation that he

would continue to improve, Plaintiff's applications were denied on reconsideration.  Tr. 161.

A year later (and two months prior to the hearing), on October 26, 2012, Plaintiff went to

Dr. Cadorette for a mental and physical RFC opinion.  Tr. 486.  In her treating notes for the visit,

she noted that Plaintiff is disabled due to brain trauma, balance disturbance and borderline

intellectual functioning as confirmed by "psychology tests."  Tr. 486.  Her notes refer to

"recurrent seizure[s]," do not indicate whether Keppra had been controlling them, but do record

that she continued Neurontin for the left side paresthesia and that Plaintiff still had observable

balance issues.  Tr. 486.  Based on eight treating encounters over more than two years, she

opined that Plaintiff's symptoms – mild left-sided weakness, balance problems, confusion,

delayed responses to intellectual problems/situations, left-arm numbness, and dizziness – are

moderate, but preclude full-time competitive employment.  Tr. 602-03.  For Plaintiff's RFC, Dr.

Cadorette opined to mild limitations in the ability to perform simple tasks; moderate limitations in the ability to respond appropriately to supervisors/co-workers and to perform repetitive and varied tasks; and moderately severe limitations in the ability to understand, remember, and carry out instructions, sustain attention and concentration, respond to customary work pressures, and perform complex tasks.  Tr. 604-05.  She also opined that Plaintiff could sit for eight hours and stand or walk for two; could lift and carry up to ten pounds occasionally; could frequently perform manipulative and postural activities; but could never be exposed to workplace hazards or environmental irritants.  Tr. 606.

At the hearing held on December 6, 2012, the ALJ expressed concern about the unusual nature of the case, Tr. 107; afterwards, he solicited new opinion evidence to address the extent of Plaintiff's neurological deficits.  First, on January 28, 2013, neurologist Dr. Mary L. Lussier performed a consultative examination.  Tr. 607-08.  During her clinical interview, Plaintiff reported he has had three "total body shaking episodes" in the past two years, but that, once or twice per week, he experiences ten-minute-long episodes of left-arm seizures preceded by confusion, and, once per week, he had episodes involving sudden loss of balance.  Tr. 607.  On examination, Dr. Lussier noted that Plaintiff's ability to perform fine finger movement with the right hand was slightly decreased, he had a mild left essential tremor and his sensory response to vibration was slightly diminished in the arms.  Tr. 607.  Dr. Lussier assessed "[r]esidual partial and probable grand mal seizures and intermittent posttraumatic dizziness as described."  Tr. 608.

After getting Dr. Lussier's opinion, the ALJ convened a supplemental hearing to obtain the opinion of neurologist Dr. Gerald Winkler, who testified as a medical expert.  Dr. Winkler affirmed that Plaintiff had experienced seizures, with at least two occurring after treatment with Keppra between January and May 2012 based on Dr. Wang's note.  He noted that Dr. Lussier's

opinion that the left arm and balance seizures were occurring more than once per week appeared inconsistent with this record reference to two seizures, but that, if Plaintiff was compliant with treatment and if Dr. Lussier's opinion was accepted, Plaintiff would meet the criteria for Listing 11.03 (epilepsy – nonconvulsive).[6] Tr. 34-37. Dr. Winkler testified that the record was insufficient to permit him to form an opinion on the frequency of Plaintiff's seizures[7] or on the degree of Plaintiff's compliance with antiepileptic medication, except that "claimant was prescribed the Keppra and was ostensibly taking it." Tr. 36. Dr. Winkler also adverted to Plaintiff's low cognitive function scores, which establish that "claimant did not have the residual brain capacity to work at any job that required significant cognitive function as opposed to pure physical work." Tr. 37. He acknowledged that Plaintiff would have difficulties learning new information, would make errors processing even simple information and that these difficulties would affect him in the workplace. Tr. 43. After suggesting seizure restrictions, Dr. Winkler opined only that there are no exertional limits on Plaintiff's ability to work, and expressed no view on Plaintiff's non-exertional limits. Tr. 46.

## II.    Travel of the Case

Plaintiff protectively applied for DIB and SSI on March 20, 2011. His applications were denied initially and on reconsideration. Tr. 127-72. On December 6, 2012, Plaintiff, with his attorney, and a vocational expert ("VE") testified at the first ALJ hearing. Tr. 60-107. Dr. Winkler and Plaintiff testified at the supplemental hearing on April 22, 2013. Tr. 32-39, 42-44. On May 15, 2013, the ALJ issued a decision finding that Plaintiff was not entitled to DIB or SSI

---

[6] See n.10, *infra*.

[7] In an attempt to solve the quandary about seizure frequency, Plaintiff's counsel was given permission to question Plaintiff about the frequency of the seizures. Plaintiff responded that he had experienced three "big seizures" but that the "other, smaller episodes" occurred every other day and lasted five to ten minutes. Tr. 40-41. This examination ended abruptly with Plaintiff's illogical response that this pattern "go[es] back about two weeks. Tr. 42; see n.4, *supra*.

because he was not disabled.  Tr. 9-23.[8]  On May 7, 2014, the Appeals Council denied Plaintiff's

request for review of the ALJ's decision, making that decision final for purposes of judicial

review.  Tr. 1-3; see 20 C.F.R. § 404.981.  Plaintiff timely filed this action.

### III.   The ALJ's Hearing and Decision

At the December 2012 hearing, Plaintiff testified that he lives with his parents, has not

driven a car in eight years and left school after ninth grade.  Tr. 75-76.  He last worked in 2008,

when he was laid off from his landscaping job.  Tr. 76.  He testified that he can no longer work

because "I lose my balance . . . I get very dizzy[,] . . . I get numbness on left side[,] . . . [t]he left

arm . . . it cramps up."  Tr. 77.  When asked about frequency, he testified that he has problems

with balance and with being dizzy "[s]ometimes, twice a week."  Tr. 78.  He described the

seizures, explaining that his arm gets tingly and then his hand cramps, accompanied by dizziness,

loss of balance and confusion, "[i]t's like a blur," and that losing his train of thought is a

phenomenon that happens "a lot[;] . . . [e]very day."  Tr. 80-85.  He reported difficulty walking,

though he does not use a cane, has no difficulty sitting, and could stand "once in a while," but

moving causes him to lose his balance.  Tr. 82-83.

The ALJ asked the VE to consider a hypothetical individual, with the same age,

education, and work history as Plaintiff, who could perform medium work, except that he could

occasionally climb stairs/ramps, balance, stoop, kneel, crouch, and crawl; could never climb

ladders, scaffolds, and ropes; and was limited to simple, routine, repetitive tasks.  Tr. 103.  The

VE testified that such an individual could not perform Plaintiff's past work as a landscaper, but

---

[8] For DIB, Plaintiff must show that he became disabled on or before his date last insured ("DLI"), March 31, 2012.
Tr. 12; see 20 C.F.R. §§ 404.315(a)(1), 404.320(b)(2).  However, Plaintiff also applied for SSI, for which DLI is
irrelevant.  See Norman v. United Mine Workers of Am. Health & Ret. Funds, 755 F.2d 509, 510 (6th Cir. 1985)
("there is no insured status requirement under Title XVI").  Accordingly, the Commissioner evaluated Plaintiff's
ability to work from his alleged onset date through the date of the ALJ's decision, rather than merely through his
DLI.

could perform other jobs as a hand packer or production worker. Tr. 103-04. However, there would be no work available if the individual could not perform simple, routine, repetitive tasks over the course of an eight-hour workday. Tr. 106.

In his decision, the ALJ applied the five-step sequential process. See 20 C.F.R. § 404.1520(a)(4). At Step One, he found that Plaintiff had not worked since February 26, 2011, his alleged onset date. Tr. 14. At Step Two, the ALJ found severe impairments of status post closed head injury and borderline intellectual functioning. Tr. 14. At Step Three, the ALJ found that Plaintiff's combined impairments did not meet or medically equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 15-17.

Before proceeding to Step Four, the ALJ determined that Plaintiff had the RFC to perform work at all exertional levels subject to the following limitations:

> [H]e must avoid all exposure to hazards such as moving machinery and
> unprotected heights. Further, [he] is limited to understanding, remembering, and
> carrying out simple, routine, repetitive tasks with the need for breaks every two
> hours.

Tr. 17-21. In making this finding, the ALJ gave "lesser weight" to the four opinions of the state agency physicians and psychologists, none of whom had seen the records reflecting the diagnosis of epilepsy. Tr. 21. He also afforded "lesser weight" to Dr. Cadorette because he found that her opinions were both not sufficiently supported by clinical findings and were inconsistent with the treatment records and the other substantial evidence in the record. Tr. 21. He accepted Dr. Armesto's test results evidencing that Plaintiff's cognitive functioning was borderline or below, but gave no weight to Dr. Armesto's conclusion that these intellectual deficits would pose "extreme difficulties" for any work other than what he already knew how to do. Tr. 381. Without indicating how he dealt with Dr. Lussier's opinion that Plaintiff's epilepsy caused him to experience nonconvulsive seizures more than once a week despite taking Keppra, he afforded

Dr. Winkler's testimony "significant weight," stating that it was the primary basis for his RFC. Tr. 21. Finally, he found Plaintiff "credible, just not to the extent alleged," but pointed to nothing other than Plaintiff's "demeanor" to support this finding. Tr. 18, 19.

At Step Four, the ALJ found that Plaintiff was incapable of performing his past relevant work as a landscaper and, at Step Five, he found that Plaintiff was not disabled because, despite his functional limitations, he could still perform the jobs identified by the VE. Tr. 22-23.

## IV.     Issues Presented

Plaintiff's motion for reversal rests on two arguments. First, he contends that substantial evidence does not support either the ALJ's RFC or the Step Five finding that Plaintiff can perform other work because the ALJ erroneously failed to include limitations related to Plaintiff's work pace and/or speed in the RFC. Second, Plaintiff argues that the ALJ erred in his evaluation of the second opinion of primary care physician Dr. Cadorette. In addition to these arguments, this report and recommendation examines the ALJ's Step Two/Step Three analysis, which resulted in the conclusion that Plaintiff's impairments do not meet a Listing.

## V.     Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

A Sentence Six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)). Essential to the materiality requirement is that the new evidence relate to the time period for which benefits were denied; evidence reflecting a later-acquired disability or the subsequent deterioration of a previous non-disabling condition is not material. Gullon ex rel. N.A.P.P. v. Astrue, No. 11-099ML, 2011 WL 6748498, at *10 (D.R.I. Nov. 30, 2011) (quoting Beliveau ex rel. Beliveau v. Apfel, 154 F. Supp. 2d 89, 95 (D. Mass. 2001) ("To be material, the evidence must be both relevant to the claimant's condition during the time period for which benefits were denied and probative.")). The plaintiff bears the burden of demonstrating that a piece of new evidence is material. See Evangelista, 826 F.2d at 139.

The majority of courts have consistently held that a subsequent allowance for a different time period, albeit one that follows closely upon the time period at issue, does not constitute new and material evidence under 42 U.S.C. § 405(g). See, e.g., Allen v. Comm'r of Soc. Sec., 561 F.3d 646, 653 (6th Cir. 2009) ("Under sentence six, the mere existence of [a] subsequent decision in [the claimant's] favor, standing alone, cannot be evidence that can change the outcome of his prior proceeding."); Jirau v. Astrue, 715 F. Supp. 2d 814, 825-26 (N.D. Ill. 2010). These courts conclude that it is mere speculation to assume, based solely on proximity in time, that the subsequent application contains favorable evidence bearing on the original application. See, e.g., Henriquez v. Astrue, 499 F. Supp. 2d 55, 58 (D. Mass. 2007). Because a subsequent determination addresses a different time period, it offers no new facts of any relevance. Evangelista, 826 F.2d at 140 n.3.

Even if the subsequent allowance finds the claimant disabled as of the day after the date of the decision on appeal, it is not material.  Allen, 561 F.3d at 653.  "The mere fact that a second [decision-maker] weighed the evidence differently does not authorize reversal by a district court; the standard is whether the first ALJ's decision was supported by substantial evidence on the record, not whether it was the only possible reasonable decision."  Perry v. Astrue, C.A. No. 10-11004-DPW, 2012 WL 645890, at *11 (D. Mass. Feb. 27, 2012).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[9] is not an "acceptable medical source."  20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight

---

[9] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

to establish the existence of a medically determinable impairment. SSR 06-03p at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B. The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work

activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

## C. Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy. Seavey, 276 F.3d at 5. To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991). It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given RFC indicated by the exertional limitations. Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

## VII.   Application and Analysis

### A.   ALJ's Step Two/Step Three Findings

A threshold issue for the Court to consider in reviewing this case is how close the record evidence comes to meeting the Listing criteria applicable to epilepsy, traumatic brain injury and intellectual disability.   While readily acknowledging the "complexity of the medical issues" posed, resulting in his decision to procure two new neurologist opinions after the first hearing, the ALJ's Step Two analysis ultimately found only two severe impairments: "status post closed head injury" and "borderline intellectual functioning."   Tr. 14, 20.   Then, at Step Three, in reliance on Dr. Winkler (ignoring Dr. Lussier), he found that the criteria for nonconvulsive (11.03) epilepsy were not satisfied;[10] based on "B" criteria findings resting principally on the opinions of the state agency opinions, who did not consider epilepsy, he found that the Listing criteria for 12.02 (organic mental disorder) were not met.[11]   Tr. 15.   And the ALJ did not

---

[10] Listing 11.03 is met by evidence of a typical seizure pattern occurring more frequently than once weekly in spite of at least three months of prescribed treatment.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.  Dr. Winkler confirmed that Plaintiff's documented seizures would meet Listing 11.03 if the criteria for seizure frequency and medication compliance are met.  Tr. 37.  Antiepileptic medication compliance seems established by the repeated record references to checking Plaintiff's blood levels with no reference to testing that showed an abnormal level.  See, e.g., Tr. 423 ("did check your keppra level . . . [i]f it is very high or very low, you will be called;" no call indicated); Tr. 384 ("[w]ill continue to follow up levels"); Tr. 392 ("check dilantin level in ED").  With respect to seizure frequency, the only examining source focused on that precise question – consultative examining neurologist Dr. Lussier – took a clinical history from Plaintiff, performed an examination, and opined to her impression of seizures between one and two times per week.  Tr. 607-08.  The only contrary evidence comes from a short period in early 2012, when Dr. Wang wrote in May: "since [January], patient has had 2 more episodes of L arm and leg numbness lasting for several min without shaking," and Dr. Cadorette wrote in March, "now seizure-free since on [Keppra]."  Tr. 383, 477.  There is nothing in Dr. Wang's note to suggest that she was focused on seizure frequency, rather than on the fact that there had been some break-through seizures.  There is nothing else in the record contrary to Dr. Lussier's assessment; after March 2012, Dr. Cadorette's treating records are consistent with Dr. Lussier's finding in that she repeatedly refers to ongoing seizure phenomena.  Tr. 475, 486, 609.  Because Dr. Winkler seized on Dr. Wang's May 2012 note as some evidence potentially inconsistent with Dr. Lussier's finding regarding seizure frequency, the ALJ found that the criteria for Listing 11.03 were not met.  See Tr. 38 (Dr. Winkler refers to Dr. Blum but means Dr. Wang based on quoted testimony); Tr. 383 (Dr. Blum's name appears below Dr. Wang's on treating note referenced by Dr. Winkler at hearing).

[11] Listing 12.02 covers the individual whose cognitive functioning has declined due to "loss of previously acquired functional abilities."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  The ALJ rejected this Listing based on the finding that Plaintiff did not meet the "B" criteria.  Tr. 15-16.  The problem is that this conclusion appears to be based on the state agency reviewers' opinions to which the ALJ himself afforded "lesser weight" because none of these reviewing sources had had the opportunity to evaluate the medical record after Plaintiff developed epilepsy.

consider or discuss the criteria for the Listing for intellectual disability (12.05), which some courts have presumed is satisfied by evidence of an IQ below 70, with a second severe impairment, as Plaintiff now presents (with an IQ of 65 and epilepsy not fully controlled by medication).[12]  At bottom, the ALJ seems to have relied heavily on the state agency reviewers' predictions that Plaintiff's cognitive functioning would continue to improve from severely impaired to moderately limited, Tr. 143, but the record does not evidence such improvement; rather, it establishes that Plaintiff's medical circumstances became more challenging with the development of the additional impairment of epilepsy.

Yet Plaintiff has not questioned the ALJ's analysis at Steps Two and Three.  While the Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion, Rodriguez Pagan, 819 F.2d at 3, it is also clear that this Court may, and should, raise issues *sua sponte* when the review of the record suggests that justice requires it, particularly when the possibility of error pertains to whether the claimant meets a Listing.  See Fowler v. Comm'r of Soc. Sec., No. 12-12637, 2013 WL 5372883, at *3 n.5 (E.D. Mich. Sept. 25, 2013); Moore v. Astrue, No. CV-10-36-GF, 2011 WL 1532407, at *3 (D. Mont. Mar. 30, 2011); Chelte v. Apfel, 76 F. Supp. 2d 104, 108 n.3 (D. Mass. 1999).  Without the

---

Tr. 21.  By contrast, with access to the complete record, Dr. Winkler confirmed that Plaintiff would have difficulty learning new information, it was plausible he would make errors in processing even simple information/tasks, and that these deficits would limit his functioning both in daily life and in the workplace.  Tr. 20, 43-44.  Yet no new "B" criteria opinion was procured.  And no analysis of the applicable "C" criteria was performed.

[12] Listing 12.05C is met by evidence of a full scale IQ of 60 through 70 that has persisted since before the age of 22 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Plaintiff has not asserted that his cognitive deficits have persisted since age 22, although one of the state agency reviewers observed that, with his education and work history, "baseline intelligence could be borderline."  Tr. 143.  Plaintiff's IQ of 65 places him in a zone that some courts have found presumptively meets Listing 12.05 (intellectual disability) when the low IQ is coupled with at least one other "severe" impairment, as it is here, linked to epilepsy or as the ALJ framed it, "status post closed head injury."  Nieves v. Sec. of Health & Human Servs., 775 F.2d 12, 13-14 (1st Cir. 1985); Grenham v. Astrue, No. 08-CV-11151-LTS, 2009 WL 1209026, at *5 (D. Mass. May 4, 2009).  If Plaintiff suffered from an IQ of 70 or below from childhood, with the fall exacerbating his condition by adding the impairment of epilepsy, Listing 12.05C would be met if there is also a finding that Plaintiff experiences "deficits in adaptive functioning."  Libby v. Astrue, 473 F. App'x 8, 9 (1st Cir. 2012) (per curiam).

benefit of argument developed by the advocacy of the parties as to these points, I am reluctant to, and do not, make a finding of a specific error. Nevertheless, the unusual travel of the case, with the full extent of the brain damage caused by Plaintiff's fall not exposed until relatively late in the processing of his applications when he developed epilepsy, poses the danger that, despite the ALJ's effort, error may have been done. Moore, 2011 WL 1532407, at *3 (when traumatic brain injury caused seizure disorder and no medical records refute claimant's testimony about seizure frequency, court sua sponte directs consideration of epilepsy listing on remand). Because the other errors raised by Plaintiff will require remand in any event, I recommend that this Court direct that the Commissioner further consider these issues on remand. Wilting v. Astrue, No. 09-CV-01207-WYD, 2010 WL 3023387, at *7 (D. Colo. July 29, 2010) (when court's duty to scrutinize the record uncovers errors, court should raise them sua sponte); Choquette v. Astrue, No. C.A. 08-384A, 2009 WL 2843334, at *10 n.2 (D.R.I. Aug. 31, 2009) (when court encounters error plaintiff did not raise, it is compelled to raise it sua sponte).

### B.     ALJ's RFC and Step Five Findings

Plaintiff's first claim of error focuses on the ALJ's failure to include in his RFC limitations based on Dr. Armesto's finding that Plaintiff's processing speed index ("PSI") score of 68 falls into the extremely low range.[13] Tr. 378. Dr. Winkler interpreted Dr. Armesto's results as compelling the conclusion that Plaintiff "did not have the residual brain capacity to work at any job that required significant cognitive function as opposed to pure physical work," that he would have difficulty learning new information and that he would make errors in processing even simple information. Tr. 37, 43. Inconsistently, the ALJ's RFC includes the ability to perform simple, routine, repetitive tasks with breaks every two hours. Tr. 17. It does

---

[13] PSI measures an individual's ability to process simple or routine visual material without making errors. Tr. 378-81. Plaintiff's "extremely low" score places him in the second percentile, with ninety-eight percent scoring higher. Id.

not incorporate any limitations concerning the speed or pace with which Plaintiff can learn or perform simple work tasks, and therefore fails to take Dr. Armesto's test results into consideration.  This omission bleeds into Step Five – by failing to include any limits that would have allowed the VE to exclude jobs that Plaintiff cannot do because he would have difficulty learning new information and would make errors in processing even simple information, the Commissioner has failed to satisfy her Step Five burden of proving that there is other work Plaintiff can perform given his RFC, age, education and work experience.  See Heggarty, 947 F.2d at 995.  The error is not harmless.  The jobs cited by the ALJ – hand packer and production worker – both require some ability to keep pace with production standards.  See Tr. 104.

The Commissioner contends that the clumsy wording of Dr. Armesto's final sentence justifies the ALJ's decision to ignore Plaintiff's inability to process simple information.  The sentence is the one that summarizes Dr. Armesto's conclusion: "[Plaintiff] would have extreme difficulties securing other type of employment due to his overall cognitive profile."  Tr. 381.  The ALJ interpreted this sentence as an opinion on work capacity, Tr. 20-21, the ultimate issue of disability, which is a matter reserved to the Commissioner.  20 C.F.R. § 404.1527(d).  When Plaintiff's counsel tried to develop the theme at the second hearing, the ALJ refused to allow Dr. Winkler to answer questions.  Tr. 21, 45.  While accepting Dr. Armesto's raw testing results as accurately reflecting Plaintiff's level of intellectual functioning, based on his interpretation of this sentence, the ALJ not only rejected outright Dr. Armesto's interpretation of his own testing, but also did not incorporate Plaintiff's extremely low PSI, and the resulting inability to process simple or routine visual material without making errors, into his RFC.  To buttress this decision, the Commissioner points to Dr. Winkler's hedging statement that Dr. Armesto's finding would make errors in performing simple tasks "plausible," but "not necessarily inevitable."  Tr. 44.

The Commissioner also argues that the ALJ properly relied on Dr. Winkler's opinion that the only functional limitation that the record supports is the need to avoid dangerous equipment or unprotected heights. Tr. 42, 46.

None of these arguments hold water.

First, Dr. Armesto's last sentence is more fairly interpreted not as a conclusory opinion that Plaintiff is disabled, but rather as an opinion that Plaintiff might be able to do tasks learned before his fall, like landscaping, but that he is no longer able to learn how to perform new tasks. Tr. 69. Read in the context of the overall report, and particularly in light of the testing establishing that Plaintiff's PSI is in the extremely low range, the latter interpretation is far more plausible than the ALJ's interpretation that Dr. Armesto was opining on the ultimate issue of disability. Further, no competent source supports the ALJ's interpretation; to the contrary, Dr. Winkler confirmed that Dr. Armesto's testing supports the conclusion that Plaintiff "did not have the residual brain capacity to work at any job that required significant cognitive function as opposed to pure physical work," that he would have difficulty learning new information and that he would make errors in processing even simple information. Tr. 37, 43. And Dr. Cadorette's opinion relies on Dr. Armesto's testing in concluding that Plaintiff's symptoms include "delay responses to intellectual problems/situations," resulting in "moderately severe" limitations in his ability to understand, carry out and remember instructions, maintain attention and concentration in a work setting, and respond appropriately to customary work pressures. Tr. 602-05.

The ALJ's error in ignoring this evidence cannot be cured by reliance on Dr. Winkler's qualifier that Plaintiff's mistakes while performing simple tasks are merely "plausible," but not "inevitable." Tr. 44. This just makes no sense – it defies logic to posit that an individual who "plausibly" will make errors at simple tasks is capable of performing such tasks with the

consistency required for full-time employment.  See Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012) (ALJ's failure to incorporate inability to learn new information in RFC is error requiring remand).  Equally flawed is the Commissioner's argument that Dr. Winkler supplied an opinion on all limitations caused by Plaintiff's cognitive deficits, proving support for the ALJ's RFC.  A quick look at the transcript establishes that, other than "seizure restrictions," Dr. Winkler's answer about applicable functional limitations was limited to exertional limits; Dr. Winkler did not express an opinion on Plaintiff's non-exertional limitations.  Tr. 46.  Accordingly, Dr. Winkler's opinion provides no support for the lack of non-exertional limits in the RFC based on the inability to learn new information or to perform simple tasks without errors.  See 20 C.F.R. § 404.1569a (limits arising from the inability to process information, to keep pace and to perform simple tasks without errors are non-exertional in nature).

In sum, the Commissioner's argument that no medical source opined that Plaintiff's raw test scores equated to particular pace/speed limitations is simply wrong.  Fairly interpreted, Dr. Armesto interpreted his own test results and opined not only that Plaintiff's ability to respond to customary work pressures is decreased but also that Plaintiff's cognitive profile would make it extremely difficult for him to learn new tasks.  Tr. 377, 381.  Dr. Winkler agreed.  See Tr. 43 (Plaintiff would "have difficulty learning new information" and "would make errors in terms of processing even simple information").  Dr. Cadorette's opinion is consistent.  Tr. 602-05.  The ALJ ignored all of these sources and, with no contrary evidence, established an RFC that ignores the substantial record evidence regarding Plaintiff's extreme cognitive deficit in the speed with which he can process information.

I find that the ALJ's failure to include Plaintiff's limitations related to speed or pace in his RFC finding is error and recommend that this Court remand the matter for further evaluation of this issue.

## C. ALJ's Evaluation of Dr. Cadorette's October 26, 2012 Opinion

More weight is generally given to opinions from treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(c)(2). Such opinions are entitled to controlling weight if well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, id., but, even if they do not qualify for controlling weight, treating sources are "still entitled to deference" and whatever weight is given, the ALJ "will always give good reasons." SSR 96-2p, 1996 WL 374188, at *4-5 (July 2, 1996). Here, Plaintiff contends that the ALJ committed multiple errors in his treatment of the October 26, 2012,[14] opinion of Plaintiff's primary care physician, Dr. Cadorette. Tr. 602-05. He argues that it merits controlling weight and that the ALJ failed both to specify what weight it was afforded and to state "good reasons" for whatever weight it got.

Dr. Cadorette's opinion – that Plaintiff's symptoms (mild left sided weakness, balance problems, confusion, delayed responses to intellectual problems/situations, left arm numbness, and dizziness) caused "moderately severe" limitations in his ability to understand, carry out and remember instructions, maintain attention and concentration in a work setting, and respond appropriately to customary work pressures – is grounded on her observations of Plaintiff and his dizziness/seizures, headaches and balance problems over the course of eight appointments during

---

[14] With good reason, Plaintiff does not argue error in the ALJ's decision to afford lesser weight to Dr. Cadorette's 2011 opinion. It consists of little more than the checking of a box indicating that Plaintiff's dizziness and seizures are moderate and the conclusion that he cannot work. Tr. 489.

the period of disability. Tr. 475-87. She also relied on Plaintiff's complaints of seizure phenomena, including left side hypoesthesia and paresthesias. Id. However, she performed almost no clinical testing of her own; rather, for "medically acceptable clinical . . . diagnostic techniques," her opinion relies largely on her interpretation of the cognitive deficits described in Dr. Armesto's report, as well as on Dr. Wang's treatment of Plaintiff for epilepsy. See 20 C.F.R. § 404.1527(c)(2). Put differently, other than her clinical observation of Plaintiff's balance problem (that he tends to fall forward when marching with eyes closed), and Dr. Wang's diagnosis, her opinion uses Dr. Armesto's test results to buttress her conclusions.[15]

The ALJ declined to give Dr. Cadorette's opinion controlling weight because it is not sufficiently supported by clinical testing and because it is inconsistent with the substantial evidence in the record, including her own treating notes. Tr. 21. However, he does not say that it was afforded no weight. Rather, the decision states that it was given "lesser weight;" adverting to the requirements of SSR 96-2p, the ALJ asserts that Dr. Cadorette's findings were "carefully considered" and were given "some weight" in establishing the RFC. Tr. 21.

The Commissioner argues vigorously that the ALJ was right in concluding that the Cadorette opinion is not worth much. To buttress this conclusion, she contends that the opinion's value is depreciated by Dr. Cadorette's unthinking adoption of what the ALJ rejected as Dr. Armesto's conclusory finding that Plaintiff lacked work capacity, a matter reserved to the Commissioner. This is simply wrong – Dr. Cadorette's treating notes make clear that she gave considerable attention to Dr. Armesto's report, including specific reference to the "tests." Tr. 483, 486. She had the report, including the results describing extremely low/borderline functioning, at the same time that she was interacting with and observing Plaintiff during six

---

[15] Dr. Cadorette's treating notes indicate that she was planning to order a psychological evaluation for Plaintiff. Tr. 485. However, once she got the report prepared by Dr. Armesto, she did not pursue another evaluation.

face-to-face appointments and also following Plaintiff's treatment by Dr. Wang. Further, her RFC opinion is not conclusory, but rather provides a nuanced[16] and function-by-function statement of Plaintiff's limitations. Whether or not Dr. Armesto's closing sentence may be brushed aside as a "vocational determination" on an issue reserved to the Commissioner, or whether it should be interpreted as an opinion regarding Plaintiff's ability to learn new tasks is beside the point. Dr. Cadorette was able to, and did, interpret the raw test results, supplemented by her direct contact with Plaintiff over a two-year period. Thus, it is error to conclude that Dr. Cadorette's opinion is not based on "medically acceptable clinical . . . diagnostic techniques."

Also troublesome is the Commissioner's attempt to buttress the ALJ's finding of inconsistency between Dr. Cadorette's opinion and the other evidence in the record, including her own treating notes. For example, the argument that Dr. Cadorette's conclusions are inconsistent with Dr. Winkler's opinion that the record does not support limitations beyond "seizure restrictions" is incorrect – Dr. Winkler opined only as to exertional limitations and expressed no view on the critical non-exertional limitations prescribed by Dr. Cadorette. Tr. 42, 46. Equally unavailing is the Commissioner's argument that the ALJ's finding of inconsistency is supported by the opinions of the non-examining state agency psychologists, who found that Plaintiff could manage simple tasks. Tr. 143-44, 146-48, 156-60. If this is what the ALJ relied on, it would amount to error. Neither of these agency opinions qualifies as substantial evidence because each was formed before much of the medical record was developed; the ALJ himself discounted them for that reason. Finally, the Commissioner points to nothing in Dr. Cadorette's treating notes that is inconsistent with the functional limitations in her opinion; to the contrary,

---

[16] For example, Dr. Cadorette found that Plaintiff is only mildly limited in his ability to perform simple tasks, but that he is moderately severely limited in his ability to understand, carry out and remember instructions and to keep pace under customary work pressure. Tr. 604.

her notes reflect her ongoing attention to Plaintiff's seizure phenomena and cognitive deficits.  In short, while Dr. Cadorette's RFC may not be supported by her own clinical testing, the ALJ's finding that it is inconsistent with the substantial evidence in the record is not well founded.

With the "good reasons" recited by the ALJ to support his determination to accord "lesser weight" to the Cadorette opinion unable to withstand scrutiny, I find that Plaintiff is right that the ALJ's treatment of it is tainted by error.  The question remains whether this error is "inconsequential to the ultimate nondisability determination," Molina v. Astrue, 674 F.3d 1104, 1117 (9th Cir. 2012), which depends on what weight the Cadorette opinion was actually given in light of the ALJ's statement that her findings were "carefully considered" and were given "some weight" in establishing the RFC.  Tr. 21.

The ALJ's articulation of what weight was given to Dr. Cadorette, on its face, is vague, though probably not fatally so.  Manley v. Barnhart, 154 F. App'x 532, 536 (7th Cir. 2005) (ALJ not required to "state precisely how much weight," beyond not controlling).  The material flaw in the ALJ's treatment of it is exposed when the use of Dr. Cadorette's opinion is compared to the ALJ's use of the opinions of the state agency psychologists.  This reveals that the ALJ used the findings and limitations in the non-examining source opinions[17] but completely disregarded those identified by Dr. Cadorette.  Although the ALJ purported to give both Dr. Cadorette and the non-examining agency psychologists the same "lesser weight," he actually elevated their opinions above hers, effectively giving them substantial weight while rejecting hers entirely.

When the relative weighing of this opinion evidence is examined in light of the ALJ's well-supported finding that the agency opinions were flawed because they did not have access to any of the medical records reflecting the diagnosis of epilepsy, the ALJ's stated "lesser weight"

---

[17] For example, the findings of the state agency psychologists appear to provide the foundation for the ALJ's "B" criteria analysis at Step Three and for all of the non-exertional restrictions incorporated (or not incorporated) in the ALJ's RFC.  None of Dr. Cadorette's moderately severe limitations are used at either Step Three or for the RFC.

for Dr. Cadorette, amounting to a complete rejection of her opinion, is plainly inconsistent with the letter and spirit of the applicable regulations and SSR 96-2p. Unlike the agency psychologists, Dr. Cadorette relied not only on treating records for the entire period from Dr. Wang, in addition to the consultative examination report of Dr. Armesto, but also on her own longitudinal treating relationship with Plaintiff. See SSR 96-6p, 1996 WL 374180, at *2-3 (July 2, 1996). With the lack of well-supported "good reasons" for rejecting Dr. Cadorette, in that there is no inconsistency with her treating records or the other evidence and Dr. Armesto's testing provided ample support for the limitations in her opinion, the ALJ's *de facto* rejection of her opinion in favor of the discredited state agency reviewers amounts to reversible error. Sargent, 2012 WL 5413132, at *9. Accordingly, I recommend that this Court remand the matter for further consideration of Dr. Cadorette's opinion.

**VIII.   Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse with a Remand for Rehearing of the Commissioner's Final Decision (ECF No. 8) be GRANTED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 9) be DENIED. I further recommend that the matter be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation pursuant to Sentence Four of 42 U.S.C. § 405(g), and final judgment should enter in favor of Plaintiff.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008);

<u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980.


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 29, 2015